J. H. POWELL and others v. R. N. IVEY and others.

*Fraud and Fraudulent Conveyances—Equity.*

1. Where the fraudulent mortgagee reconveys the land to the fraudulent mortgagor, before any lien attaches in favor of the creditors of the former, they cannot subject the land to the payment of their debts.

2. A fraudulent vendee is under no legal obligation to reconvey, though morally bound to do so; but a court of equity will give no aid where both the vendor and vendee participate in the illegal transaction.

CIVIL ACTION tried, upon a referee's report, at November Term, 1880, of HALIFAX Superior Court, before *Graves, J.*

The defendants appealed from the judgment rendered.

*Messrs. Mullen & Moore,* for plaintiffs.

*Messrs. Burton, Batchelor* and *Day & Zollicoffer,* for defendants.

SMITH, C. J. The facts of this case are few and simple, as found by the referee and accepted and acted on by the court.

Richard N. Ivey, to whom the land in dispute belonged, with an express intent to defraud his creditors, on January 1, 1867, executed a mortgage deed therefor to his son, John R. Ivey, reciting his indebtedness to the mortgagee by bond, to which two others of his children were sureties, in the sum of one hundred and fourteen dollars, with interest from that date, and declaring the purpose of the conveyance to be to secure the same. There was nothing then due from the mortgagor to the mortgagee—no such bond was in fact given—and the deed was purely voluntary.

John R. Ivey accepted an agency at Rocky Mount for the Wilmington and Weldon Railroad Company, and entered into bond with the plaintiffs as his sureties for the faithful discharge of the duties of said appointment, in the sum of five thousand dollars, and for his dereliction in said agency, and the misapplication of

the money received in that capacity, he was sued by the company, and judgment recovered at spring term, 1871, of Edgecombe superior court, against him for the sum of $3,173.77, the amount due for his defalcation, and interest thereon, from the first day of December preceding. Of this sum he has paid $375, and the residue was paid over to the company on February 1, 1871, just before the institution of this suit, by the sureties.

On January 18, 1871, John R. Ivey reconveyed the land to his father by a deed reciting the prior mortgage and the purpose expressed in it, the full payment on January 1, 1868, of the secured debt, and bearing date on the 2d day of said month, to which the two alleged sureties to the bond are subscribing witnesses.

On January 24, 1871, six days thereafter, the said John R., by another deed, then executed, reciting the suretyship of the plaintiffs on his bond and his desire to secure them from loss by reason of their liability, conveyed to them "all his right, title and interest in the lands of Richard N. Ivey, conveyed to him by mortgage deed of January 1, 1867," with general warranty, as an indemnity against loss, with power of sale in case of his default in making payment of the sum for which he and his said sureties were liable to the company, for the term of two years thereafter.

A short time before reconveying to his father, at the latter's instance, the plaintiffs' attorney applied to an attorney of the said Richard N. Ivey for information in regard to the interest held by his son, John R., in the land, and stated that the latter contemplated securing them therewith. The attorney of said Richard N. stated to them that John R. had no interest in the land, that nothing was due to the latter from the former, and that the mortgage deed of January 1, 1867, was made to defeat the collection of a debt (in which the mortgagor was a surety merely) out of his estate.

On July 5, 1871, several judgments were rendered in behalf of different creditors against Richard N. Ivey before a justice of

33

the peace, which, on the 7th of the same month, were docketed in the office of the superior court clerk of Halifax, upon which executions issued, and the lands, the Fulghum tract, estimated to contain forty acres, and the tract whereon the execution debtor then resided, supposed to contain five hundred and twenty-five acres, were sold and conveyed to the defendant, James T. Gooch.

To the finding of the referee the court added the further fact that said Richard N., when he took the deed of reconveyance from his son, knew the intent of the latter to be to defraud the railroad company and prevent a recovery of its debt.

The action is prosecuted by the sureties to have the title declared to be vested in them by virtue of the deed of mortgage executed by John R. Ivey on January 24, 1871, and for a decree of foreclosure and sale of said lands, in order to their re-imbursement for money paid as his surety by each.

The referee, in his conclusions of law, declares the plaintiffs entitled to the relief sought, and so the court ruled, rendering judgment for the sale of the lands, unless the sum ascertained to be due the plaintiffs, and therein mentioned, be paid on or before a date fixed in the said judgment.

From this judgment the defendants appeal, and upon the hearing, the appeal was dismissed but re-instated on the docket, and the defendant, Richard N., having meanwhile died, his heirs, whose names are mentioned in the affidavit of R. B. Ivey, are made parties defendant in his stead.

Leaving out of view the controversy as to title between the heirs-at-law of the intestate, Richard N., and the defendant, Gooch, the purchaser at the execution sale, we do not concur in the opinion of the court that the plaintiffs have acquired any equity or right which will be enforced against any of the defendants. The reconveyance by the fraudulent mortgagee rested upon a moral obligation to restore the property to the fraudulent mortgagor, so that it may be directly subject to his debts, and thus, a decree of nullity be rendered unnecessary to creditors pursuing their remedies against his property. It is the undoing

'of an unlawful act which ought not to have been done, and where no intermediate liens have attached, as in this case none had, the reconveyance will be upheld. This has been ruled in several cases cited by counsel, and with the suggested modification.

The case most in point, and directly sustaining the proposition, is that of *Clark* v. *Rucker*, 7 B. Mon., 583, decided by the court of appeals of Kentucky in 1847. The plaintiff's intestate made an absolute bill of sale of certain slaves held by him to his mother, the plaintiff, to place them beyond the reach of creditors, in case of an unsuccessful issue of a speculation in which he had embarked, and with a secret understanding that they were to be held in trust for the vendor's wife and infant child. John Clark, the vendor, died, and the vendee, William, held and used the slaves for the benefit of the wife and child, until, finding himself involved as a surety upon the official bond of the sheriff, he executed a deed conveying the slaves to the persons specified in the parol trust, reciting therein the trusts attaching to the transfer of title to himself.

The creditors of the plaintiff undertook to pursue the property and subject it to the satisfaction of their claims, which had been reduced to judgment. The court ruled against the plaintiffs, declaring that if the "fraudulent vendee had retained the title to the slaves, they would no doubt have been liable for the payment of his debts, because, as between the parties themselves, the contract being executed, would have been obligatory on them, and irrevocable at the instance of the vendor"; and it is added, that although the transfer to the widow and child could not have been compelled, yet the fraudulent vendee "having done that which in good conscience he should have done, and the title having been vested in, and the possession delivered to, the widow and child of the fraudulent vendor, *before the creditors of the fraudulent vendee had acquired any lien on the property,* the circumstances attending the transaction may be relied upon by them by way of defence to the claim asserted by the creditors."

The same principle is asserted in *Davis* v. *Graves*, 29 Barb., 480, where the purchaser of land caused title to be made to his brother for the purpose of placing it beyond the reach of his creditors, and was afterwards conveyed by the grantee to the purchaser. The creditors of the grantee undertook to follow the land and subject it to their debts. The court refused to give relief, saying, that he, the depositary of the title for the unlawful purpose alleged, "was under no legal obligation to make such conveyance, but he was under a high moral and equitable obligation to do so. The law is not so unjust that it will deny to men the right, while it is in their power to do so, to recognize and fulfill their obligations of honor and good faith. Until the creditors of Daniel Graves (the grantee) *had acquired liens upon this land*, they had no legal or equitable claims in respect to it, higher than, or superior to, those of Jacob Graves."

The same rule is again recognized in the ruling of the commission of appeals in New York, in the briefly reported case of *Cramer* v. *Blood*, 48 N. Y., 684.

There is another aspect in which the case may be looked at. The plaintiffs, through their counsel, were made acquainted with the fraudulent character and purpose of the deed to John R. Ivey, before the instrument under which they claim was executed; and moreover, they have advanced no money upon it, but it was taken as an indemnity against an existing liability. They are, therefore, themselves seeking to enforce an agreement, itself tainted with fraud, as against the creditors of Richard N. Ivey. And what status do they have to ask the aid of a court of equity in foreclosing the mortgage, itself the known offspring of a previous fraudulent mortgage? As the court would not assist John R. in decreeing a sale to support such a transaction as between himself and his father, neither will it help in enforcing the mortgage from the son to the plaintiffs. It will leave both to take and abide by what has been done, but will not come to the relief of either.

But it is said that the reconveyance is itself a fraud upon the

rights of the creditor company, and of the plaintiffs subrogated to its rights. The answer to this is, that the land does not belong to the son; so that, he is unable to restore it to the rightful owner and render it liable to his creditors. A restoration to the owner before liens attach, as the cases cited show, is the execution of an act of moral duty, which, however, a court of equity will not assist in, when both participate in the illegal transaction upon a well settled rule, cannot be a fraud upon the creditors of the fraudulent alienee, nor can they assail the validity of the return of the property.

Without inquiring into the relative rights of the defendants, *inter sese*, we are of opinion that the plaintiffs are not entitled to relief, and their action cannot be maintained. It must be declared there is error, and the action is dismissed.

Error.                                    Dismissed.