## Higgs' Ex'x v. Higgs' Ex'x et al.

April 25, 1941.

Beulah Hampton, S. G. Wilkerson and R. H. Cannon for appellant.

Allen P. Cubbage for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

W. C. Higgs (hereinafter referred to as Willie) died on Feb. 8, 1938, at the age of 54, a resident and citizen of Grayson County, Kentucky, after having executed a last will on Feb. 5, 1938, which was duly probated in the Grayson County Court. He devised $400 to his stepson, and all the remainder of his estate to his wife with the provision that if $1,500 remained after her death, that sum should go to the children of his sister, Gertrude Boggs. This action was instituted by testator's 90 year old father, Isaac Higgs (hereinafter referred to as Isaac), to have the paper adjudged not to be the will of his son on the grounds of undue influence

and lack of testamentary capacity. Isaac died before the case came to trial and the action was revived in the name of his executrix.

The jury found for the will and Isaac's executrix seeks to reverse the judgment because: (1) The verdict is flagrantly against the evidence; (2) the propounders were permitted to testify for themselves after they had previously introduced other witnesses in chief; (3) the court refused to permit contestant to read the depositions of the two subscribing witnesses; (4) the will is so unnatural as to show such a lack of testamentary capacity that it cannot be sustained in the absence of a reasonable explanation of its terms by the propounders.

Willie was a widower without children and in 1925, he married Maude Bruce, a widow. At the time of her marriage to Willie she had a small son, Kinser Bruce, about 7 years of age who resided with his mother and stepfather until the latter's death. This child had inherited $400 from his father and Mrs. Higgs had inherited something over $1,000 from her first husband. Willie, along with his own funds, invested his wife's and his stepson's money in a home, the title to which was taken jointly in him and his wife. There were no children born to the marriage and there is testimony in the record from several witnesses that on various occasions Willie expressed an intention to make a will to protect his wife and to assure a return of the $400 to his stepson. The property composing the estate is shown, but the record does not give its value; however, it appears not to be large.

On Sept. 18, 1936, Willie and his wife entered into a writing with his 88 year old father, Isaac, wherein they agreed to support and care for the latter during life and to bury him at death in consideration of $1,000 which the old gentleman paid in cash upon the execution of the contract. Because the will did not mention the father and made no provision for him, the contestant vigorously insists it was so unnatural that when unexplained it showed Willie lacked testamentary capacity.

On Monday, Jan. 31, 1938, Willie became ill with double pneumonia and Dr. J. C. Tucker, his family physician, was called and daily visited Willie professionally from that time until his death, Feb. 8th, except he did not see the patient on Feb. 1st. Dr. Tucker had Dr. C.

L. Sherman in consultation and the latter saw the patient on Friday and Saturday, Feb. 4th and 5th, and on other occasions during his illness. The will was written between 12:30 and 1:30 P. M. Saturday, Feb. 5th, by Hon. John M. Campbell, a lawyer of excellent standing, who was Assistant Attorney General at that time.

Dr. Tucker saw testator three times on this Saturday; between 8 and 9 o'clock A. M.; between 2 and 3 o'clock P. M.; and at 8 o'clock in the evening. His temperature ranged from 102 to 102.5 during that day, and that evening it was 103. Dr. Tucker testified that testator "was sleeping or in a kind of semiconscious state," but when you spoke to him and got him aroused he was rational and capable of making a will; that he remained rational until Sunday or Monday. Dr. Sherman, who was introduced by contestant, testified that at 7 P. M. on Friday (the day before the will was written) testator was muttering; "That means that there was some delirium." On cross-examination when asked if Willie had testamentary capacity, he testified, "Well, from talking to the man I'd say yes, but when you come to consider those things it is a little difficult, because I was delirious once myself, and I thought I knew everything, but since I got well I see I didn't." Dr. Marcus Phelps, who did not see the patient and who testified for the contestant in answer to a hypothetical question setting out Willie's condition, stated that if he were delirious he did not have testamentary capacity, but that condition could clear up and the patient would be capable of making a will. Dr. W. L. Osman, who testified for the propounders, was another witness who did not see the patient. In answer to a hypothetical question, his testimony was to the effect that a pneumonia patient will often mumble when not aroused, but arouse him and he is completely normal.

Miss Beulah Hampton, a lawyer of high standing and a niece of the testator, her mother, Mrs. Nancy C. Hampton, and Mrs. Arpie Irth, the latter two being sisters of the testator, each testified that on Sunday around noon Willie was unconscious. But they were contradicted by Claude Kinser, a brother-in-law of testator, who made the trip from Louisville with these three women. Claude testified Willie was conscious around noon on Sunday. Mrs. Nancy Hampton testified that about 7 o'clock Monday morning Willie was per-

fectly conscious and asked her to look after their father, and upon inquiry from her stated he had made no will.

Mr. Campbell testified he obtained the data from Willie at his home about 12:30 on Saturday, the day the will was written, went to his office and wrote the will and brought it back to testator's home. Upon hearing it read, Willie said he (Willie) had omitted an item providing a bequest to the children of his sister, Gertrude Boggs. Thereupon Mr. Campbell went to his office, redrew the paper and incorporated therein the omitted provision and upon taking it back to Willie's home, the testator said the will was like he wanted it and signed same before Robert Bond and W. S. Clarke, as witnesses. Mr. Campbell, the two witnesses to the will and several other laymen who had excellent opportunities for observation, testified Willie Higgs possessed testamentary capacity on the afternoon the will was written.

The two physicians who attended Willie testified he was capable of making a will on Feb. 5th; and the two physicians who did not see him, but who answered hypothetical questions, were also of the opinion that he possessed such capacity. While there was a conflict among the lay witnesses as to whether or not Willie was capable of making a will the fact that he had his will corrected so as to incorporate therein a bequest to the children of Mrs. Boggs is strong evidence that he possessed testamentary capacity. It is patent the verdict for the will was not flagrantly against the evidence.

After the propounders proved the due execution of the will, the contestant then assumed the burden as is the practice in will contests. The contestant, Miss Hampton, was a witness. After all her testimony was in and after she had announced through, the propounders called her to the stand and further cross-examined her. While the record does not show that Miss Hampton was recalled for further cross-examination, yet it does show that this was what actually took place. There is no merit in the contestant's complaint that in calling her back to the stand for further cross-examination the propounders contravened Section 606, Subsection 3 of the Civil Code of Practice, forbidding a party to testify for himself in chief after introducing other testimony for himself.

Further complaint is made by contestant because

the court refused to let her read the depositions of the two subscribing witnesses, Bond and Clarke, both of whom were present at the trial and each had testified on behalf of the will. In reference to the reading of a deposition as provided in Section 554 of the Civil Code of Practice, it was written in Dailey v. Lexington & E. R. Co., 180 Ky. 668, 203 S. W. 569, 574:

> "A deposition of a witness in an action at law is taken subject to the contingency that the witness who gives the deposition will not be present in court at the trial, and is never competent when the witness is present at the trial and able to testify."

See Johnson v. Langley, 247 Ky. 387, 57 S. W. (2d) 21; Stevens' Adm'r v. Watt, 266 Ky. 608, 99 S. W. (2d) 753; and Nashville, C. & St. L. R. Co. v. Byars, 240 Ky. 500, 42 S. W. (2d) 719, wherein it is pointed out that the deposition of a party taken on cross-examination may be read although he be present at the trial, but the deposition of a witness who is not a party cannot be read if such witness is present. As Bond and Clarke were not parties to the action and as they were present in the court, the judge properly refused to permit the contestant to read their depositions.

Lastly, contestant argues that as the will made no provision for Willie's aged father, Isaac, it is so unnatural as to show such a lack of testamentary capacity that it cannot be sustained in the absence of a reasonable explanation of its terms by the propounders, citing Harrell v. Harrell, 62 Ky. 203, 1 Duv. 203; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474; Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751; and other like cases. An examination of these authorities show they support no such proposition. They hold that where there is gross inequality in the disposition of the estate among the natural objects of testator's bounty, or where the will is unnatural, such facts, when unexplained and when corroborated by even slight evidence of want of testamentary capacity, or of undue influence, are sufficient to take the case to the jury. See Wiggington's Ex'r v. Wiggington, 194 Ky. 385, 239 S. W. 455 and Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. (2d) 505.

However, in the instant case the will was neither

inequitable nor unnatural because there was a contract between Willie and his father, Isaac, wherein the former obligated himself to support and care for the latter during life and to bury him at death. This contract assured Isaac such protection regardless of the provisions of the will. With his father thus provided for by the contract, what will could be more natural and more equitable than the one before us where a stepson was reimbursed for money which went into the home, with the balance of the estate devised to the widow and with the further provision that if there were $1,500 remaining at her death, it should go to the children of testator's sister, Mrs. Boggs? There is no place in this record for the doctrine applicable to inequitable or unnatural wills; and if there were, such doctrine could only take the case to the jury. Here the court did submit the case to the jury and there is no criticism of the instructions. The jury found for the will and this record shows the verdict is abundantly supported by the evidence, and contestant has no just grounds for complaint.

The judgment is affirmed.